UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
BOSE CORPORATION, BOSE. G.P. OF IRELAND, :
and BOSE B.V.,
:
                       Plaintiffs,      05 Civ. 10182 (CSH)
:
    -against-                  MEMORANDUM OPINION
:
SILONSONNIC CORP. A/K/A SILONSONNIC CORP.,
DAN SASSON D/B/A www.silonsonnic.com, and SAGI : 
HABER D/B/A www.djsagi.com,
:
                       Defendants.
-----------------------------------------------------------------------X

<u>Haight</u>, Senior District Judge:

      In this case, plaintiffs Bose Corporation and certain European affiliates ("Bose" or "Plaintiffs") sought a preliminary injunction enjoining defendants Dan Sasson and Sagi Haber ("Defendants") from selling Bose home entertainment sound reproducing systems, called LIFESTYLE systems, on Ebay or various websites operated by defendants or over the phone, and from using Bose's copyright- or trademark-protected material in its advertisements of the Bose systems. Defendants generally opposed the imposition of an injunction, but seemed to concede that their websites and Ebay advertisements had wrongfully used Bose's copyrighted images and/or text.

      After issuing a Temporary Restraining Order and Seizure Order, the Court held an evidentiary hearing on January 24-27, 2006, on Plaintiffs' motion for a preliminary injunction. Marketing and technical witnesses from Bose testified. The testimony of the individual defendants was received in the form of sworn declarations. Numerous documentary exhibits were received. The parties submitted a useful joint stipulation of material facts.

1

On February 1, 2006, the Court issued a Preliminary Injunction and Order granting certain, but not all, of the relief requested by Bose. Most importantly, the Court enjoined Defendants from marketing, selling, or exporting Bose LIFESTYLE systems to third parties outside the United States and Canada. The Preliminary Injunction and Order also enjoined Defendants from making any unauthorized use of Bose's copyrights or trademarks. In this Opinion, the Court will explain the reasoning behind the Preliminary Injunction and Order.

## DISCUSSION

### I.     Standard for Preliminary Injunction

In this circuit, "[a] party seeking a preliminary injunction must demonstrate (1) irreparable harm in the absence of the injunction and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor." *MyWebGrocer, LLC v. Hometown Info, Inc.*, 375 F.3d 190, 192 (2d Cir. 2004) (internal quotation marks and citation omitted). In addition, the party seeking the injunction must satisfy a higher standard, by showing a clear or substantial likelihood of success, where (I) the injunction sought is "mandatory" – i.e., it will "alter, rather than maintain, the status quo," or (ii) the injunction, whether or not mandatory, "will provide the movant with substantially all the relief sought and that relief cannot be undone even if the defendant prevails at a trial on the merits." *Tom Doherty Assoc., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 33-34 (2d Cir. 1995); *see also Sunward Elec., Inc. v. McDonald*, 362 F.3d 17, 24 (2d Cir. 2004). In this case, however, the Court need not address which standard is more appropriate because, regardless of which standard is applied, my ultimate conclusions are the same.

**II.     The Trademark Infringement Claim**

As noted, Plaintiffs sought an order enjoining Defendants from selling Bose LIFESTYLE systems commercially over the Internet, using websites or Ebay, or via telephone. Plaintiffs assert that Defendants' practice of selling Bose equipment is illegal in several respects,[1] but the essence of their claims in this regard, as expressed at oral argument, is that the goodwill and reputation of Bose's registered trademarks are damaged and/or diluted by Defendants' sale of Bose products to buyers in Europe, as well as in the American market (*see* note 3, *infra*).

**A.     European Market**

The majority of counsel's oral argument focused on damage done to Bose as a result of Defendants' sales to the European market. While not pressing an assertion that the LIFESTYLE systems sold by Defendants are counterfeit,[2] counsel for Bose essentially argued that Bose's trademarks (and associated goodwill) were devalued because the Bose systems sold by Defendants were inferior to the Bose systems that a European consumer would purchase from an authorized Bose dealer in Europe. That is because, Bose argued, the Bose LIFESTYLE systems that Defendants offer for resale are manufactured for the American market, while LIFESTYLE systems sold by

---

[1] Plaintiffs allege tortious interference with contract, copyright infringement, federal trademark infringement and counterfeiting, federal trademark dilution, false advertising, unfair competition, New York common law unfair competition, New York common law trademark infringement, dilution under New York General Business Law § 360-L, willful false and deceptive trade practices in violation of New York General Business Law § 349, and New York common law civil conspiracy. *See* Verified Complaint.

[2] In fact, it appears that in many if not most instances Defendants acquired the Bose products that they offered for resale from Bose authorized sellers, mainly in and around the New York metropolitan area. *See* Sasson Declaration ¶¶ 10-12. Defendants reportedly acquire the systems at a discount by buying in bulk or negotiating favorable prices. *Id.*

authorized European dealers are manufactured for the European market,[3] and significant differences exist between the European and American LIFESTYLE systems. Among the differences highlighted by Bose: European-market products have voltage specifications of 220V or 240V instead of 110V;[4] RDS capabilities; different FM deemphasis; different tuner increments; remote controls and receivers that function on 40 MHZ; a different radio antenna connection; an owner's manual in wider variety of languages; a SCART adaptor for connection to European-style televisions; an "Xcode", which enables region-free DVD operation; are marked with 'CE' to signify compliance with European voltage requirements; and have a two-year warranty, as compared to a one-year warranty in the U.S.

Defendants, who as noted advertise for sale to European customers LIFESTYLE systems manufactured for use in the American market, attempt to adjust for some of these differences by modifying the American-market LIFESTYLE systems to function in Europe. In order to address the voltage differential, Defendants make the following modifications: for the bass module in black/silver LIFESTYLE systems, Defendants include a step-down transformer to convert the voltage from 220V or 240V to 110V (Joint Stipulation of Facts Not in Dispute ¶ 47); for the tri-voltage white systems they offer for sale, Defendants merely include in the package a European

---

[3] Bose manufactures the LIFESTYLE systems intended for the European market at a factory in Ireland, while those LIFESTYLE systems intended for the American market are manufactured at a factory in Mexico. The "European market" includes continental Europe and the United Kingdom. The "American market" includes the United States, Canada, and Puerto Rico.

[4] The LIFESTYLE system primarily consists of a media center and a bass module. Both the media center and bass module utilize their own power source. In all cases, American-market LIFESTYLE media centers are configured to operate on 110V, whether the systems are black/silver or white. However, while the majority of the LIFESTYLE systems made for the American market (the black and silver systems) have bass modules that are configured for 110V, the bass modules of certain of the American-market white LIFESTYLE systems are manufactured to be tri-voltage (110V, 220V, or 240V).

power cord, sometimes of Bose's own construction (*id.* ¶ 51); for the media centers, Defendants included a 115V/230V power adaptor (*id.* ¶ 63). In order to modify the media center portion of the American-market LIFESTYLE system to play European DVDs, Defendants unsealed the packages containing the Bose systems they purchased in the United States, attached the media center to Defendants' computer via a serial cable, and used software to change the DVD region settings. *Id.* ¶¶ 41-42. Defendants assert that those two areas of modification, voltage/power supply and DVD region code settings, were the only areas of modification needed to allow the American-market LIFESTYLE systems to function in the European market. Sasson Decl. ¶ 16.

Plaintiffs challenged that assertion. They contended with vigor that Defendants' modifications to systems made in Mexico for use in the American market do not allow those systems to function in Europe as well as systems made in Ireland for use in the European market. Besides the possible adverse side effects of using the step-down transformer supplied by Defendants to adapt the 110-volt American system for use with European 220-volt power,[5] Bose pointed to the lack of RDS capability on American-market systems, the lack of the Bose-made special SCART adaptor,[6] and the differences in FM deemphasis,[7] remote frequencies, and warranty as clearly indicating that

---

[5] Bose technicians have a protocol for modifying an American-built LIFESTYLE system for use in Europe if the American purchaser has been transferred to Europe and cannot bear to leave his Bose system behind. But the Bose technicians do not simply hand the soon-to-be expatriate a transformer or suggest that he buy one at Radio Shack. Instead, they open up the back of the bass module, and replace the power supply PCB and transformer with a different, proprietary Bose part, which "allows this unit to operate at the appropriate, proper voltage level in Europe." Oral argument of counsel for Bose, at Tr. 29.

[6] The Bose SCART adaptor allows certain automatic adjustments to the aspect ratio of a DVD, i.e. wide-screen versus normal format.

[7] I understand the difference in FM deemphasis is intended to maximize the listening experience of the European consumer by matching up the receiving capabilities of the radio

the use of the American-market Bose LIFESTYLE systems in Europe results in a sub-optimal audio/visual experience for European purchasers of Defendants' Bose products, depriving those purchasers of the complete benefits of the European-market products. Further, Plaintiffs asserted, and the evidence seems to support the conclusion, that Defendants' advertisements mislead European purchasers into believing that the Bose products offered for sale by Defendants would, in fact, function optimally in the European market, when that is not the case.

Based on the testimony and documentary evidence presented at the hearing, I find as a fact that, compared to what a European consumer could normally expect to experience when purchasing a European-market LIFESTYLE system, the modified American-market LIFESTYLE systems offered for sale by Defendants would be inferior.

That finding is sufficient to entitle Bose to a preliminary injunction with respect to Defendants' sales to European purchasers. Bose has a legitimate interest in keeping inferior goods passed off as optimal-performing Bose products out of the European market; doing so insures that the value of Bose's highly respected trademarks are not diluted or damaged. "One of the most valuable and important protections afforded by the Lanham Act is the right to control the quality of the goods manufactured and sold under the holder's trademark." *El Greco Leather Prod. Co. v. Shoe World, Inc.*, 806 F.2d 392, 395 (2d Cir. 1986) (citation omitted); *see also Polymer Tech. Corp. v. Mimran*, 37 F.3d 74, 78 (2d Cir.1994) ("[T]rademark law serves to guarantee the quality of the trademarked product, and the sale of inferior goods with a true mark will clearly undermine the value of the trademarked brand as a guarantor of quality.") (internal quotation marks and citations omitted).

---

receiver to the signals typically broadcast in Europe. *See* Testimony of Bill Allen, at Tr. 202-03.

Defendants' counsel asserted at oral argument that Bose cannot claim to be concerned about its quality control in this case, because Bose did not act to make it publicly known that differences existed between the Bose products manufactured for the American and European markets, and, further, took no measures to ensure that its American-market products do not reach the European market. Defendants' counsel relied on *Polymer*, 37 F.3d 74, in support of those arguments. Neither argument is persuasive.

In the first place, the relevant holding in *Polymer* stands only for the proposition that, where trademark infringement is alleged based on a theory of noncompliance with a plaintiff's quality control measures, the plaintiff must actually have in place and comply internally with such quality control measures. *See Polymer*, 37 F.3d at 78-80.[8] I am unable to discern in *Polymer* or any other case the requirement that a plaintiff such as Bose would have to publicize any differences in its products intended for different markets in order to be entitled to the protection afforded by the Lanham Act in the form of a right, enforceable by the courts, to control the quality of the goods manufactured under its trademark.

---

[8] In that case, the plaintiff, manufacturers of opthalmic products, including contact lens solution, distributed its products, with certain differences in packaging and labeling, to two types of entities: retail stores and professional eye-care practitioners. *See Polymer*, 37 F.3d at 77. The plaintiff sued the defendant for trademark infringement and counterfeiting for allegedly obtaining plaintiff's products intended and labeled for eye-care professionals and then selling those products to retailers. *See id.* at 76. The plaintiff asserted that the defendant's distribution of goods in such a manner violated the plaintiff's trademark rights because the solutions intended for eye-care professionals that defendants sold on the retail market did not meet the plaintiff's quality control standards for retail products. *See id.* at 78. The district court found, however, that the plaintiff itself failed in several respects to ensure that the products it intended for the retail market complied with the quality control standards purportedly in place. *See id.* at 78-79. As a result, the district court did not "accept [the plaintiff]'s theory of trademark infringement based on [the defendant]'s alleged circumvention of [the plaintiff]'s quality control efforts," and refused to issue a preliminary injunction. *Id.* at 80. The Second Circuit affirmed.

Secondly, in the case at bar, Bose has several mechanisms in place for ensuring that the American-market goods, which will perform optimally for American-market consumers, are indeed sold to consumers in the American market, and that European-market goods, which will perform optimally for European-market consumers, are sold to consumers in the European market. As an initial matter, the Bose LIFESTYLE systems intended for the American market are manufactured in North America (Mexico), and the systems for the European market are manufactured in Europe (Ireland). Moreover, Bose endeavors to ensure that systems made in Mexico for the American market are sold only in that market, and systems made in Ireland for the European market are sold only in that market. For example, Bose markets and sells American-market systems to American purchasers over the Internet through the www.bose.com website, while the Bose U.K. website (www.bose.co.uk) is used to solicit business in the United Kingdom, and other European country-specific Bose websites target and sell European-market products to consumers in those countries. Further, as stated in note 5, *supra*, Bose technicians will assist in modifying an American-market Bose LIFESTYLE system for use in Europe, but only if the consumer who is going abroad has owned the LIFESTYLE system for a minimum of one year. That temporal limitation, a Bose witness testified, is intended to prevent Bose American-market systems from being purchased, modified, and then promptly resold in the European market.

In short, the record makes it clear that Bose has in place and implements measures to ensure that consumers in each of the markets at issue in this case receive those Bose systems manufactured for use in those markets, which as a result would provide the most refined audio/visual experience for the consumer. Despite Defendants' counsel's argument, the Court has not been directed to any precedent that would support the conclusion that either these measures or the existence of differences

8

between the LIFESTYLE systems built for the two markets need to be made publicly known. Further, Defendants did not allege, or offer any evidence, that Bose does not comply with such quality control measures intended to provide the optimal experience to consumers. Accordingly, as Bose has these quality control measures in place, and as Defendants' sales of the American-market LIFESTYLE systems to the European market are plainly inconsistent with those measures, and, further, apparently provide a sub-optimal audio/visual experience to European consumers, the strength of Bose's trademark in Europe is damaged by Defendants' practices. Plaintiffs have thus shown a clear and substantial likelihood of success on the merits, *see Sunward Elec., Inc. v. McDonald*, 362 F.3d 17, 24 (2d Cir. 2004), and irreparable harm is therefore presumed, *see Dunkin' Donuts Inc. v. National Donut Restaurants of New York, Inc.*, 291 F. Supp. 2d 149, 152 (E.D.N.Y. 2003) (citation omitted), satisfying the test for the issuance of a preliminary injunction.[9]

## B. American Market

Plaintiffs also asked the Court to enjoin Defendants' sales of American-market Bose LIFESTYLE systems to purchasers in the United States. Obviously, the concerns discussed above regarding the quality-affecting differences between the systems manufactured for the American and European markets are not relevant to the analysis of this request, as Defendants are selling American-market Bose products to American-market consumers, without it being necessary to make any modifications or supply any additional accessories. An action for trademark infringement "will not arise where the goods being sold are genuine goods bearing a true mark." *Polymer*, 37 F.3d at 78.

---

[9] As noted in text *supra*, the Court need not decide which standard for the imposition of a preliminary injunction applies, as Plaintiffs have satisfied either standard.

However, Plaintiffs contended that the quality of the Bose systems sold by Defendants to American consumers is nonetheless compromised, and, therefore, Bose's reputation and trademark are being devalued or diluted in the American market. In support of this claim, Plaintiffs asserted that the Bose manufacturer's warranty is an integral part of any LIFESTYLE system, and, as the systems sold by Defendants are purportedly not covered by the warranty, those products are again inferior to those goods sold by Bose authorized dealers.

Assuming without deciding that the lack of an enforceable warranty standing alone is sufficient to render a product inferior for trademark infringement analysis purposes, it is by no means clear that the LIFESTYLE systems sold by Defendants to American purchasers are, in the hands of those purchasers, without warranty. The language of the Bose warranty provides that the warranty is transferrable if the system was originally purchased from a Bose authorized dealer (and proof of purchase can be provided), and the evidence in this case is that the Defendants frequently obtained the LIFESTYLE systems they offered for resale from Bose authorized dealers.[10] Bose has arguments available to it for the non-enforceability of the warranty in these particular circumstances, but the most that can be said for its position is that the question is a fair ground for litigation, and here the balance of hardships tips decidedly in favor of Defendants, the nonmoving party. In consequence, Plaintiffs are not entitled to a preliminary injunction with respect to Defendants' resales of LIFESTYLE systems in the American market.

### III. The Copyright Infringement Claim

Plaintiffs also sought an order enjoining Defendants from using Bose's copyright- or trademark-protected images or text in Defendants' advertisements of the Bose equipment Defendants

---

[10] *See* note 2, *supra*.

offer for sale on their websites or in their Ebay listings. Verified Complaint ¶¶ 66-69, XXII(D)(1). Defendants conceded that, in the past, they have copied copyrighted images and/or product descriptions from Plaintiffs' websites for use in advertisements on Defendants' websites and/or Ebay listings. Sasson Decl. ¶ 11; Joint Stipulation ¶ 32. Defendants offered no real defense for this use of Plaintiffs' copyrighted material, but claimed that they were unaware such use violated copyright laws. Sasson Decl. ¶¶ 13, 27. Defendants did, however, assert that they no longer use material copied from Plaintiffs' websites in their advertisements. While recognizing that that may indeed be the case, given the fact that Defendants had admittedly made unauthorized use of protected Bose material in the past, and possibly could again in the future, the Court was satisfied that the showing required for a preliminary injunction had clearly been made, and therefore granted Plaintiffs' request for a preliminary injunction enjoining Defendants from making unauthorized use of Bose's copyrights or trademarks, in any of their advertisements or otherwise. If, as Defendants have asserted, they only used the protected images and text because they were unaware such use was improper, and they ceased such use once they learned of the impropriety of that use, Defendants should have no trouble complying with such an injunction.

## CONCLUSION

For the foregoing reasons, the Court issued its Preliminary Injunction and Order, dated February 1, 2006, granting in part and denying in part Plaintiffs' request for a preliminary injunction.

Dated: New York, New York
February 7, 2006

CHARLES S. HAIGHT, JR.
SENIOR UNITED STATES DISTRICT JUDGE

11